UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| LINDA HUNTSBERGER, | ) ) ) |
| Plaintiff, | ) ) 3:13-cv-00270-RCJ-VPC |
| vs. | ) ) |
| CITY OF YERINGTON et al., | ) **ORDER** ) |
| Defendants. | ) ) ) |

This case arises out of an alleged hostile workplace environment and unlawful retaliation. Pending before the Court is a Motion for Summary Judgment (ECF No. 32). For the reasons given herein, the Court grants the motion in part and denies it in part.

I.  **FACTS AND PROCEDURAL HISTORY**

Plaintiff Linda Huntsberger was the City Clerk of Defendant City of Yerington (the "City") from May 29, 2007 until her termination. (*See* Compl. ¶¶ 6, 23, ECF No. 1). During her employment, Defendants Mayor Douglas Homestead and City Manager Dan Newell used derogatory terms to refer to women, i.e., Newell repeatedly called Plaintiff a "fucking bitch" and Homestead referred to non-parties as "fucking cunt," "fucking bitch," and "bitch" in Plaintiff's presence. (*Id.* ¶¶ 9–11). Homestead and Newell also made derogatory remarks about Hispanic people. (*Id.* ¶ 12).[1] Plaintiff complained to Homestead and Newell to no avail. (*Id.* ¶ 13).

---

1 Plaintiff presumably means to allege a race-based HWE, not a national-origin-based HWE.

When Plaintiff complained to the Human Resources office, no corrective action was taken; rather, Defendants retaliated against her for having complained. (*Id.* ¶ 14). First, Homestead and Newell began executing City contracts without Plaintiff's statutorily required signature. (*Id.* ¶¶ 15–17). Plaintiff complained to the Attorney General and met with an investigator. (*Id.* ¶¶ 18–19). When Homestead and Newell learned of the investigation, they further retaliated against Plaintiff. (*Id.* ¶¶ 20–21). Newell ordered Plaintiff not to speak to any other City employees or City Council members under threat of termination. (*Id.* ¶ 22). On one occasion, Newell screamed at Plaintiff for speaking to a City employee and ordered her to leave the building. (*Id.* ¶ 24). Newell and Homestead caused Plaintiff's proposed termination to be placed on a City Council agenda on the pretext of poor performance, and she was terminated. (*Id.* ¶ 23). They also disclosed portions of Plaintiff's confidential employee file to a local newspaper. (*Id.* ¶ 25).

Plaintiff sued Defendants in this Court for: (1)–(2) hostile workplace environment ("HWE") based on sex under Title VII of the Civil Rights Act of 1964 and Nevada Revised Statutes ("NRS") section 613.330; (3) HWE based on national origin (presumably under Title VII and NRS section 613.330); (4) retaliation in violation of the First Amendment (presumably under 42 U.S.C. § 1983); (5) retaliation in violation of NRS section 281.641; (6) retaliation in violation of Title VII; and (7) retaliation in violation of NRS section 613.330. Defendants have moved for summary judgment against all claims.

## II.     LEGAL STANDARDS

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute as to

a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In determining summary judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec.*

*Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. See Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. See *Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III.   ANALYSIS

#### A.   Gender-Based HWE Under Title VII and NRS Section 613.330

As to the gender-based HWE claims, Defendants argue that the alleged verbal comments are legally insufficient to support the HWE claims.  "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (citations omitted).  A Title VII offense requires more than "mere utterance of an . . . epithet" causing offensive feelings but does not require an environment so severe as to cause a nervous breakdown. *Id.* at 21–22.  The conduct must be severe or pervasive enough that a reasonable person would consider it hostile or abusive. *Id.* at 21.

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

>with an employee's work performance.  The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.  But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* at 23.  The upshot of this language is that claims of a working environment where abusive treatment or language is arguably "severe" or "pervasive" ought to be determined by a jury.

Plaintiff has testified that on one occasion, Homestead entered Roy "Mac" MacDonald's office in the Public Works Department when Plaintiff was present and referred to a woman named Colleen as a "fucking bitch" and "fucking cunt" because of a power struggle between them. (*See* Huntsberger Dep. 38–39, ECF No. 36-1).  Plaintiff did not report the incident to anyone, although she told Homestead she couldn't believe he was talking that way. (*Id.* 39–40).  On another occasion, Homestead said in Plaintiff's presence, "Those fat, fucking bitches are at it again.  They fucking filed a suit against me." (*Id.* 70–71).  On another occasion, Homestead said about a woman who was leaving the room but still in earshot, "I hate that fucking bitch.  I would like to smack her up along side of the head." (*Id.* 76).  Newell once referred to Plaintiff as "that fucking bitch" when she was leaving a meeting. (*Id.* 96–98).  Newell once referred to a woman from the Department of Taxation as a "that fucking bitch" in Plaintiff's presence while the woman was on speakerphone, and the woman heard the comment. (*Id.* 101).  Homestead or Newell (it isn't clear from the excerpt of the transcript) once referred to meetings of the city clerks in Nevada as "just a bunch of cackling old hens" when telling Plaintiff that she didn't need to attend. (*Id.* 142).  Newell once commented that no women were smart enough to do the work at the City. (*Id.*).  One time, a woman who had been abused had come to City Hall, and Homestead commented that "[m]ost of the time they deserve it." (*Id.* 143).  The circumstances do not make clear the remark was meant to refer to women being abused, but that is how Plaintiff perceived it. (*See id.* 143–45).  The evidence adduced is sufficient for Plaintiff to satisfy

her shifted burden as to the gender-based HWE claims, even assuming Defendants could satisfy their initial burden.[2]  There is admissible evidence of repeated comments indicating disdain for women made in Plaintiff's presence, with at least one comment made about Plaintiff herself. The Court denies summary judgment on these claims.

Defendants note that the Charge of Discrimination Plaintiff filed with the EEOC does not identify Homestead, but only Newell, and they argue that this limits the Court's jurisdiction to claims against Newell. (*See* Charge of Discrimination, ECF No. 32-1, at 137).  "Subject matter jurisdiction extends to all claims of discrimination that fall within the scope of the EEOC's actual investigation or an EEOC investigation that could reasonably be expected to grow out of the charge." *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 644 (9th Cir. 2003) (citing 42 U.S.C. § 2000e–5(b); *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099–1100 (9th Cir. 2002)).  Title VII charges may be brought against persons not named in a charge of discrimination if those persons were involved in the acts giving rise to the charge and should have anticipated the claimant would name them in a lawsuit. *See Sosa v. Hiraoka*, 920 F.2d 1451, 1458–59 (9th Cir. 1990).  Homestead is alleged to have made the same kinds of misogynistic comments that Newell is accused of in the Charge of Discrimination.  The Court will therefore not grant summary judgment to Homestead simply because he is not named in the Charge of Discrimination.  If Homestead worked for a different agency, the matter would be different.  In that case, there would be an issue of notice.  But because the Charge of Discrimination is against the "City of Yerington," and because Homestead, like Newell, worked for the City, and apparently worked closely with him, there is little doubt that Homestead, like Newell, was made aware of the charges and should have expected to be named in an eventual lawsuit.

---

2 The Edwards and Castello Affidavits contain mostly inadmissible character evidence as to Newell's alleged history of sexism.

Finally, Defendants are simply wrong that acts occurring more than 180 (or 300) days before the Charge of Discrimination was filed cannot be considered as contributing to the HWE claim:

> In determining whether an actionable hostile work environment claim exists, we look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  To assess whether a court may, for the purposes of determining liability, review all such conduct, including those acts that occur outside the filing period, we again look to the statute.  It provides that a charge must be filed within 180 or 300 days "after the alleged unlawful employment practice occurred."  A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e–5(e)(1).  The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened.  It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.
>
> That act need not, however, be the last act.  As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring.  Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.
>
> It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct.  The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability.  And the statute does not contain a requirement that the employee file a charge prior to 180 or 300 days "after" the single unlawful practice "occurred."  Given, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. *In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment*.

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116–18 (2002) (citations and footnote omitted; emphasis added).  The Court is perplexed how Defendants have purported to extract a rule from this case that any acts that would be time barred under Title VII if brought as discrete acts of discrimination cannot be included as part of an HWE claim.  The case quite clearly stands for the opposite proposition.  Plaintiff does not bring any claims based on discrete, discriminatory acts.  Apart from her retaliation claims, she alleges only HWE claims.  Because at least one of the acts contributing to the HWE claim occurred within the relevant limitations period, all of the acts encompassing the HWE claim are properly considered in assessing the unitary claim.

### B.     National-Origin-Based HWE Under Title VII and NRS Section 613.330

As to racially derogatory comments, Plaintiff admitted that she had never heard Homestead make any such comments, (*see* Huntsberger Dep. 54), but she testified that Newell had once said to another person in her presence, "I want you to go get your gun, and I want you to go down there and pop off a few of those Mexicans.  They make our town look bad." (*Id.* 54–55).  On another occasion, Newell said, "I hate Mexican beans.  They're just a bunch of beaners." (*Id.* 55).  Plaintiff told Ms. Sheema Shaw about the incident but never reported it to anyone else. (*Id.* 55–61).  There was another incident where Newell said, "Now there's just a bunch of Goddamn Mexicans there [at the Catholic Church]." (*Id.* 66–67).  Plaintiff could not recall any other racially hostile comments made by Newell. (*Id.* 66).  The Court grants summary judgment on the national-origin-based HWE claim.  Defendants have noted that there is no evidence of severe or pervasive racially hostile comments, and there is not enough evidence adduced in response to support a finding of severity or pervasiveness.  Three comments indicating dislike for Mexican persons over the course of several years, none of which were directed towards Plaintiff is not enough.  The same is true of a potential claim based on a

religiously hostile environment. A single comment concerning the prevalence of Mexicans at the local Catholic Church (of which the speaker himself apparently claimed to have been a member), is neither severe nor pervasive.

The Court notes that it is not clear there is no evidence of any race-based comment within 300 days of Plaintiff having filed her Charge of Discrimination on August 31, 2011. The last race-based comment was allegedly made in "late summer" or "fall" of 2010. (*See id.* 126–28). The last day of Fall 2010 was December 20, 2010, 254 days before the Charge of Discrimination was filed on August 31, 2011. There is no evidence of the exact date, however. If there were evidence of a severe or pervasively racially hostile workplace environment, the Court would not be inclined to grant summary judgment on the basis of untimeliness but rather would be inclined to submit a special interrogatory to the jury on the issue.

### C. First Amendment Retaliation Under § 1983

> In order to state a claim against a government employer for violation of the First Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the employer took "adverse employment action"; and (3) that his or her speech was a "substantial or motivating" factor for the adverse employment action.

*Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003). Not all speech is protected, however. "[W]hile the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 718 (9th Cir. 2009) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006)). The Supreme Court has stated:

> When a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). If an employee does not speak as a citizen, or does not address a matter of public concern, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Ibid.* Even if an employee does speak as a citizen on a matter of public concern, the

> employee's speech is not automatically privileged. Courts balance the First Amendment interest of the employee against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).

*Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2493 (2011); *see also id.* at 2500–01 (holding that the analysis under the Petition Clause mirrors the analysis under the Speech Clause). Analysis of a First Amendment retaliation claim consists of:

> a sequential five-step series of questions: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Desrochers*, 572 F.3d at 708–09 (quoting *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)). If the speech did not touch on a matter of public concern, the inquiry ends. *See id.* at 709. Plaintiff bears the burden of showing that his speech addressed an issue of public concern, based on "the content, form, and context of a given statement, as revealed by the whole record." *See id.* (quoting *Connick*, 461 U.S. at 147–48). "[T]he essential question is whether the speech addressed matters of 'public' as opposed to 'personal' interest." *Id.* (citing *Connick*, 461 U.S. at 147).

In *Desrochers*, four sergeants of the San Bernardino Police Department ("SBPD") filed an informal grievance about their Lieutenant. *Id.* at 705. When the Lieutenant found out about the grievance, he requested a transfer, which was granted, and the aggrieved sergeants had little to no contact with the Lieutenant thereafter. *Id.* at 706. Two of the sergeants resolved their grievance, but Sergeants Desrochers and Lowes went on to file a formal grievance against the Lieutenant, the Chief of Police, and the Captain who had adjudicated the informal grievance. *Id.* The formal grievance, which was supported by declarations describing several incidents,

essentially alleged that the Lieutenant was a bully who had created a "hostile work environment" and that neither the Captain nor the Chief of Police had taken appropriate steps to remedy the situation. *See id.* at 706–07.  The Captain denied the formal grievance. *Id.* at 707.  Desrochers and Lowes then filed a complaint with the City's Human Resources Department ("HR") against the Lieutenant, the Lieutenant's replacement, the Captain, and the Chief of Police, and HR eventually denied the complaint. *Id.* at 708.  Desrochers was transferred from the Homicide Unit to the Robbery Unit, which he viewed as a demotion, and Lowes had become the subject of an internal affairs investigation based on an arrest he had made, resulting in a two-week suspension. *Id.* at 704.

Desrochers and Lowes filed a § 1983 action for First Amendment retaliation, as well as several state law claims, but the district court granted summary judgment to the defendants because the speech at issue did not address matters of public concern. *Id.* at 708.  The Court of Appeals affirmed, noting that "the essential question is whether the speech addressed matters of 'public' as opposed to 'personal' interest," which is a question of law upon which a plaintiff bears the burden. *Id.* (citations omitted).  The line is between "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government" on the one hand, *see id.* at 710 (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)), and "speech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies'" on the other, *see id.* (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (quoting *McKinley*, 705 F.2d at 1114)).  The court specifically rejected the plaintiffs' attempt to characterize their concerns about their supervisors' competence and the morale of the police force generally as issues of public concern as opposed to internal power struggles. *See id.* at 710–11.

The Court made several further points.  First, it is the content of the speech that matters, not a plaintiff's "post hoc characterizations" of the grievance. *Id.*  Second, conclusory allegations of the "negative" effects of a supervisor's behavior are insufficient; a plaintiff must allege concrete negative results. *Id.* at 712–13.  Third, the Court noted that *Desrochers*'s claim that his speech was an issue of public concern was seriously undermined by the fact his grievance was purely internal. *Id.* at 714–15.  The court summarized its holding by stating that "while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." *Id.* at 718 (quoting *Garcetti*, 547 U.S. at 420).  By contrast, where an employee's speech is in the form of public trial testimony, for example, the employee is protected from retaliation. *See Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1104 (9th Cir. 2011) (distinguishing *Desrochers*).

Plaintiff alleges complaining to an outside ethics commission, the Attorney General, and the Secretary of State that Newell had been signing documents that Nevada law required Plaintiff (the City Clerk) to sign. (*See* Huntsberger Dep. 175–88).  However, Defendants are correct that Plaintiff spoke as a public employee; not as a private citizen.  This was a dispute about a statutory provision of concern only to Plaintiff in her capacity as the City Clerk, i.e., that Plaintiff's signature was required and that Defendants were wrong to bypass her.  Plaintiff's complaints to the state offices were made in her capacity as the City Clerk, not as a private citizen.  The Court need not address qualified immunity.

**D.      Retaliation Under NRS Section 281.641**

This is the claim under the state "whistleblower" statute.  Defendants argue that a claim for retaliation for reporting improper governmental activity under the statute cannot lie if the complained-of activity was not in fact improper, and that Defendants' actions in bypassing Plaintiff's signature were not in fact improper because the City of Yerington is governed by

Chapter 268, not by Chapter 266 as Plaintiff previously supposed, and Chapter 268 does not require the City Clerk to attest or sign contracts. The Court disagrees. Persons making incorrect claims are protected by the statute. *Simoniam v. Univ. & Cmty. Coll. Sys. of Nev.*, 128 P.3d 1057, 1064 (Nev. 2006).

Defendants also argue there is no evidence that Plaintiff was terminated for having made her complaints as to this issue or even that Defendants knew of the complaints before her termination. The Court finds this to be true of both this claim and the First Amendment retaliation claim. Plaintiff testified only that she told Sheema Shaw about her complaints to the state agencies, not any Defendant. (*See* Huntsberger Dep. 188–93). Therefore, there is not enough evidence of causation in this case to put the claim to a jury. Moreover, the statute at issue provides an administrative remedy via the Nevada Department of Personnel. At most, judicial review is permitted after an adverse ruling. There is no evidence of exhaustion of administrative remedies.

E.     Retaliation Under Title VII and NRS Section 613.330

Defendants argue that there is no evidence of protected activity before Plaintiff's termination. It is not disputed that Plaintiff filed her Charge of Discrimination in August 2011, long after she was terminated in May of that year. (*See* Charge of Discrimination; Huntsberger Dep. 224). But Plaintiff alleges her termination was in retaliation for having complained of her treatment to "Human Resources," not for having filed the Charge of Discrimination. (*See* Compl. ¶¶ 14, 53, 58). By "Human Resources," Plaintiff appears to mean Sheema Shaw. The Court finds that there is a genuine issue of material fact whether Plaintiff's complaint to Ms. Shaw concerning the misogynistic comments was the basis for Plaintiff's termination. Although there is no evidence of any complaint having been communicated directly or indirectly to Homestead or Newell, it is a fair inference that they knew about the complaint.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 32) is GRANTED IN PART and DENIED IN PART.  The motion is granted as to all claims except those for a sexually hostile workplace environment and retaliation under Title VII and NRS section 613.330.

IT IS SO ORDERED.

Dated this 5th day of January, 2015.

_____
ROBERT C. JONES
United States District Judge